O'DONNELL et al. v. GENEVA METAL WHEEL CO.

No. 10994.

United States Court of Appeals, Sixth Circuit.

May 25, 1950.

Meyer A. Cook, Cleveland, Ohio (Davis & Young, Cleveland, Ohio, on the brief), for appellants.

J. A. Butler, Cleveland, Ohio, and Kenneth D. Carter, Cleveland, Ohio (Bulkley, Butler & Rini, on the brief), for appellee.

Before ALLEN, MARTIN, and Mc-ALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

On May 16, 1944 appellant O'Donnell, while engaged in the performance of his duties at an automobile service station in Chicago, was repairing a rubber tube and tire. He had replaced the tire on the rim of a steel wheel and was inflating it with compressed air, when, during the application of the air hose to the valve of the tire, the wheel suddenly disintegrated and flew apart, striking him with great violence on the right side of his face and head, with the result that he was seriously and permanently injured. O'Donnell and the United States Casualty Company, under certain rights of subrogation, brought suit in the United States District Court for the Northern District of Ohio against appellee, Geneva Metal Wheel Company, as the manufacturer, alleging it to be guilty of negligence causing the accident, because of defective construction of the wheel, and liable, regardless of privity of contract with appellant, because of its having placed a dangerous instrumentality on the market. Appellants are hereinafter referred to in the singular, as appellant O'Donnell.

At the conclusion of the proofs, appellee moved for a directed verdict on the ground that there was no evidence that appellee was the manufacturer of the wheel, and that there was no adequate proof that it had been guilty of negligence by reason of defective construction of the wheel and placing it upon the market. The district court directed a verdict, and appellant appeals from the judgment entered thereon, insisting that the question whether appellee was the manufacturer of the wheel, as well as appellee's negligence in manufacturing a defective wheel and placing it upon the market were questions of fact, properly determinable by the jury, and that the district court was in error in deciding such questions itself and directing a verdict. It was appellee's contention that the most likely cause of the accident was the application of excessive air pressure to the tire mounted on the wheel.

For a clear understanding of the issues on appeal, the following outline of the circumstances surrounding the accident may be helpful. The wheel involved in the suit was formed of two steel disks. Each disk was concave at its circumference. Placed back to back, with their concave surfaces out, the disks were riveted together with six ferrules, that is, hollow rivets. When the disks were riveted together, a rim was formed around their circumference by the two outwardly concave edges or flanges. On this rim, a pneumatic tire was mounted. The wheel in this case was manufactured for, and used on, a large ballbearing wheelbarrow.

In joining the two steel disks together to form the wheel, the hollow rivets are subjected to a pressure of 140 tons in the riveting die, and the end of each rivet opposite the flange is curled on the underside of the wheel to form another flange, thus holding the two disks firmly together. The designer of the Geneva wheel testified that the wheel was designed by him to withstand a pressure of 120 pounds per square inch. The recommended air pressure for a four-ply tire on the wheel was 60 pounds per square inch, so that the wheel, as designed, would have a factor of safety of 100%.

In support of his claim, appellant introduced the evidence of two engineers, one possessing a Bachelor of Science degree in engineering and a Master's degree in physical chemistry, the other, a Bachelor of Science degree in chemistry. Both witnesses had considerable experience in metallurgy, one having spent eighteen years in the testing laboratory of the Continental Can Company, and the other having been for eight years Assistant Technical Director of the Cosma Laboratories, whose chief work was testing metals for private manufacturers and for the military services of the government. These witnesses testified that the hollow rivets that held together the two halves of the wheel causing the accident were defective; that five of the six rivets had radial cracks in the rolled-over edge of the hollow rivet; that these cracks would have the effect of materially weakening the rivets; and that the rolled-over edge of the rivets also had a thinned-out section where they had been rolled to a point which further weakened them. They gave it as their expert opinion that the radial cracks could have been seen at the time of manufacture and could only have existed before the parts of the wheel separated at the time of the accident, because at that time, the curled or rolled-over edges of the rivets were pulled back through the rivet holes in the disk, and this action would tend to close the radial cracks rather than open them. They further declared that the rivets also contained circular cracks which would tend further to weaken them. Each of the expert witnesses, apart from the other, made his examination of the rivets and the wheel prior to the trial, and arrived at his conclusions, independently of the other. They gave as their opinions, with accompanying reasons based on their examinations of the wheel and the rivets, and in the light of their expert knowledge and experience, that the disintegration of the wheel in question, which caused the injuries complained of, was due to defects in the rivets existing at the time of manufacture, and not to the application of excessive air pressure to the pneumatic tire and tube mount-

ed on the wheel. Their testimony further disclosed that the thinning alone of the rivets, which had been testified to, would cause the two disks of the wheel to be forced apart and to disintegrate if an air pressure of 40 pounds per square inch had been applied to a tire mounted on the wheel. An air pressure of 40 pounds per square inch, which, according to the above testimony, would cause the wheel to disintegrate, would be less than the pressure recommended by the designer of the wheel of 60 pounds per square inch for a four-ply tire, and only one-third of the pressure of 120 pounds per square inch which the wheel was designed to withstand.

With the foregoing evidence of the construction of the wheel and its alleged defects in mind, we come to the circumstances surrounding the accident. Appellant O'Donnell, having repaired the tube and inserted it in the tire casing, mounted it on the rim of the wheel and began to inflate the tube with compressed air to a pressure of 48 pounds per square inch. The tire in question was designed to carry a normal air pressure of 60 pounds per square inch. The air came from a tank having a pressure of between 120 and 180 pounds per square inch. The hose used by appellant had no valve controlling the pressure from the tank. Appellant first applied the air hose to the valve of the tube, causing the air to pour into the tire. He then removed the hose from the valve and applied a gauge to the tube valve which showed the air pressure in the tire to be between 18 and 20 pounds per square inch. He again applied the hose, and again gauged the pressure, finding it to be between 25 and 30 pounds. He did not remember applying the hose again or anything else that subsequently happened when the two sections of the wheel flew apart and caused the accident.

Appellee contends that the evidence of O'Donnell's two expert witnesses as to the defects in the wheel and their existence at the time of manufacture was based on unjustified assumptions, was wholly theoretical and speculative, and of no weight whatever; that the claimed cracks or fractures in the rivets were invisible to the naked eye; that the wheel had been properly in-spected and tested with the degree of care required in such cases at the time of its manufacture; and that the district court had no alternative other than to disregard such expert opinion and direct a verdict as though no such evidence had been given. At this point, it should be said, however, that the evidence of appellant's expert witnesses disclosed that in their opinion the cracks in the rivets were visible to the naked eye at the time the wheel was manufactured, and that they were of a nature that could only have existed prior to the accident.

On behalf of the appellee, testimony was introduced to the effect that each piece of material in the wheel was personally examined by an operator at each stage of the manufacture; that the foreman made periodic examinations in each department through which the wheel passed; that one wheel out of every 1,000 manufactured was tested by causing its tire to be subjected to hydrostatic pressure of 125 pounds per square inch in order to ascertain whether the two disks of the wheel would separate under such pressure; that some of the wheels were assembled without tires and placed on the market, and such wheels, which were sold without tires, had never been subjected to the pressure tests; that at final inspection after assembly of a wheel, it was carefully inspected by an inspector whose job it was to see that the product was properly made; that in such inspections, fractures or cracks in the curled side of the hollow rivets had been noticed on several various occasions, and in such cases, the defective fractured rivets were removed and replaced. An official of a tire company testified, on behalf of appellee, that he had supervised many tests, applying pressure to tires mounted on appellee's wheels, and had found that the two riveted halves of the wheel would separate when a pressure of 150 pounds per square inch was applied to the tire. This, he stated, was the average pressure that would cause the wheel to disintegrate, but a wheel would sometimes separate when a pressure of 130 pounds per square inch was applied to the tire.

In sum, one-tenth, of 1% of the wheels which were equipped with tires were tested by appellee with air pressure. The wheels which were sold without tires were not so tested. Sufficient air pressure in the tires caused perfect wheels to fly apart violently. During inspections, on various occasions, appellee found that the rivets holding together the two parts of wheels manufactured by it were cracked or fractured and, in such cases, the defective rivets were removed and others substituted. Appellant's expert witnesses testified that in their opinion, the rivets were defective and cracked at the time of manufacture of the wheel in question, and that such cracks could have been seen with the naked eye. They further stated as their opinion that because of the defective rivets, the parts of the wheel would have been forced apart by the application of an air pressure to the tire, less than that recommended for use by the designer of the wheel. Under the foregoing circumstances, it can not be said that appellee's evidence of inspection of its wheels was a complete defense to the action. See Liggett & Myers Tobacco Co. v. De Lape, 9 Cir., 109 F.2d 598, 601.

Upon consideration of all of the evidence, the district court directed a verdict of no cause of action on behalf of appellee. In directing the verdict, the court stated that, five years after this accident, it was sought to extend the "Implement of Danger" doctrine to the case where the manufactured article was not essentially dangerous; that, in such a case, substantial evidence of an affirmative nature should be presented to justify jury consideration. The court then went on to give its reasons for its conclusion that appellant had not carried the burden of proof, stating that the opinion evidence of appellant's expert witnesses was "not of the reliable character or weight, in my opinion, to justify a submission of the case against what I conclude is the greater weight of the evidence that the wheel was adequate for the normal uses for which it was intended or manufactured." The court said that its reaction to the evidence was that it was more likely that the rupture of the wheel was caused by excessive air pressure from an unrestricted source than that it was caused by a defect in the wheel assembly, particularly in the rivets; that an examination of the rivets and the nature of the distortion of the body of the disk and the holes through which the rivet ends were pulled "seems to me to evidence and support a finding that the application of excessive air pressure rather than failure due to defective manufacture caused the violent separation." The court further declared that it was not impressed that there was adequate proof that appellee, in the exercise of due care, could or should have adopted some additional tests or inspections other than those testified to; and that the testimony of appellant's expert witnesses as to what probably happened in the manufacture, based solely upon examination of the metal after violent rupture, was speculative compared to the method of manufacture, required specifications, tests and inspections, to which appellee's wheels were subjected.

Much as the district court was persuaded that the evidence introduced by appellant had no weight sufficient to support a verdict, we are of the view that the above questions discussed by the court in directing the verdict were all questions of fact properly determinable by the jury. The weight and credibility of the testimony of appellant's expert witnesses were for the jury. It was for the jury to determine whether the cracks and fractures in the rivets existed at the time of manufacture of the wheel; whether such fractures were at the time visible to the naked eye; whether the rivets and wheel were weakened by such fractures; whether the wheel separated and flew apart as the result thereof when less than the air pressure recommended by the designer of the wheel was applied to the tire; and whether the accident resulted from appellee's negligence. Scott et al. v. United States, 6 Cir., 161 F.2d 1009. See Howard v. Louisiana & A. Ry. Co., 5 Cir., 49 F.2d 571.

Appellant's expert witnesses, as well as appellee's former chief engineer and the designer of the wheel in question, stated that if the rivets were defective, the wheel would be inherently dangerous. In the now celebrated case of MacPherson v.

Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440, Judge Cardozo laid down the fundamental rule that if the nature of a finished product placed on the market by a manufacturer to be used without inspection by his customers is such that it is reasonably certain to place life and limb in peril if the product is negligently made, it is then a thing of danger; its nature gives warning of the consequences to be expected; and, if to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser and used without new tests, then irrespective of contract, the manufacturer of the dangerous instrumentality is under a duty to make it carefully; and this principle is not limited to poisons, explosives, and things of like nature which, in their normal operation, are implements of destruction. The rule thus announced is followed by this court and the majority of federal and state courts. Barrett Co. v. Bobal, 6 Cir., 74 F.2d 406; Goullon v. Ford Motor Co., 6 Cir., 44 F.2d 310. See Carter v. Yardley & Company, 319 Mass. 92, 64 N.E.2d 693, 164 A.L.R. 559. The foregoing doctrine is here applicable. If the wheel in question were negligently made by appellee, and, as a result, was violently ruptured, causing the accident in this case, appellee would be liable in damages.

■ Appellee contended that there was no evidence that it manufactured the wheel in question and that, therefore, a judgment should have been directed in its favor for this reason alone. The district court did not rule on this contention. It appears that, on the trial, the parts of the wheel that caused the accident were submitted, during his testimony, to the chief engineer who had designed appellee's wheel. In response to the questions of appellant's counsel, he stated that he could point out no features of dissimilarity between the wheel that caused the accident and the wheels manufactured by appellee. Neither the designer of appellee's wheel nor the president of appellee company, during testimony, was able to deny that the wheel that flew apart was manufactured by appellee company. None of the wheels carries any trademark or any other identifying mark; they were not patented and, consequently, could be manufactured by anyone. Other companies did manufacture similar wheels, but the evidence disclosed that although such wheels were similar in a general way, there were various points of marked dissimilarity between all of such wheels and those manufactured by appellee. The wheel that caused the accident was the only one in evidence identical to the wheels manufactured by appellee, and none of appellee's engineers or officials could point out the slightest difference between the wheels, or say that the wheel in question was not their product. We are of the opinion that the foregoing constituted sufficient evidence to submit to the jury the question whether the wheel that caused the accident was of appellee's manufacture. Of course, if it were proved by appellee that another party manufactured wheels identical to the wheel in question, then appellant's proof, if the same as on the trial below, would be sufficient. For in such a case, there would be a complete absence of probative facts to support a conclusion that appellee's wheel had caused the accident and no reasonable basis for inferring fault to the appellee. See Pennsylvania Railroad v. Goldie, 6 Cir., 182 F.2d 9, where Judge Simons has, in the light of the most recent decisions of the Supreme Court, delineated the functions of the jury to pass upon issues of fact, and the function of the court to determine whether there is substantial evidence to submit such issues to the jury.

Counsel for appellee emphatically point out that appellant, in his complaint, set forth, on information and belief, that the owner of the wheel in question had purchased it from the Perkins Supply Company; that the Perkins Company purchased it from the Lansing Company; and that the Lansing Company purchased it from appellee. Appellant submitted proof that the Lansing Company purchased wheels identical to the wheel in question from appellee, and that the owner of the wheel purchased it from the Perkins Company. However, he did not attempt to prove that the Perkins Company purchased it from

the Lansing Company, as he had outlined in his complaint. Why this proof was not made or attempted is unexplained. Appellant's case would, of course, be stronger if such proof were forthcoming; but its absence does not result in a fatal failure of proof. There was sufficient evidence from which reasonable inferences could be drawn that the wheel in question was one of appellee's wheels, to take the case to the jury on this phase, regardless of the deficiency of proof of the chain of sales back to the manufacturer.

Finally, appellant submits that a verdict may not be directed for a defendant merely because the trial judge feels that, should the jury find in plaintiff's favor, he would regard it as his duty in the exercise of a sound judicial discretion, to set the verdict aside. Such contention correctly states the rule, and is in accord with the decision of this court in Scott et al. v. United States, supra.

Pursuant to the foregoing, the judgment is set aside and the case remanded to the district court for a new trial.